SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**PAUL T. MALONEY, OSB #013366**
Paul.Maloney@usdoj.gov
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:24-cr-00391-IM-1** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **CARLOS MANUEL PEREZ LOPEZ,** | |
| **Defendant.** | |

Defendant is before the Court for sentencing for his role within a Mexico-based drug trafficking organization responsible for transporting enormous quantities of narcotics into Oregon. Pursuant to a plea agreement, he pled guilty to Count One of a superseding information alleging conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii) and 846. The parties have agreed to a sentence range of 96-144 months' imprisonment to be followed by four years' supervised release. The government recommends a sentence of 144 months because it is consistent with the advisory sentencing guidelines, proportional to

**Government's Sentencing Memorandum**                                    **Page 1**

defendant's conduct and criminal history, accounts for defendant's history and circumstances, and avoids unwarranted sentencing disparities.

## I.    SENTENCING CALCULATIONS

### A.    PSR Guideline Calculation

Consistent with the Presentence Report (PSR), the government calculates defendant's advisory guideline calculations as follows:

| Provision | Description | Offense Level Calculation |
|---|---|---|
| USSG § 2D1.1(c)(2) | 30,000-90,000 KG of Converted Drug Weight | BOL=36 |
| USSG § 2D1.1(b)18 | **No Safety Valve** | -- |
| | **Adjusted Offense Level** | **36** |
| USSG § 3E1.1 | Acceptance of responsibility | -3 |
| | **TOTAL OFFENSE LEVEL** | **33** |

The parties have agreed to many guideline provisions. The parties have agreed that defendant is not eligible for the two-level safety valve adjustment because defendant has not completed a debrief with the government. Nor is defendant eligible for any role adjustments, as he was a typical distributor of bulk narcotics. The parties have agreed to recommend a three-level acceptance of responsibility reduction which produces a total offense level of 33. The PSR correctly calculates defendant's criminal history category of II. As part of the plea agreement, the government has agreed to forgo an 851 enhancement for defendant's prior serious violent offense (2016, Assault II conviction PSR ¶ 47). Prior to any variances, this produces a total offense level of 33 and an advisory guideline range of 151-188 months' imprisonment.

### B.    The Government's Recommended Sentence

Pursuant to the plea agreement, the government has agreed to recommend a two-level downward variance for defendant's early indication of his intention to resolve this complex wiretap case. After this reduction, the defendant's advisory guideline range is 121-151 months'

imprisonment. The plea agreement allows defendant to argue for an additional variance to a sentence of not less than 96 months' imprisonment.

The government's recommends a mid-range sentence of 144 months' imprisonment. For the reasons that follow, this sentence is sufficient, but not more than necessary to achieve the goals of sentencing, and no further reductions are warranted.

## II.      ARGUMENT

### A.      Factual Summary

The PSR writer accurately summarized the relevant facts of the government's investigation. PSR ¶¶ 21-30. In summary, defendant was in possession of bulk quantities of methamphetamine and fentanyl that he conspired with other to distribute for profit.

In September 2024, DEA task force investigators had identified co-defendant Hugo Alberto Roman Aparacio (Roman) as local drug distributor who would frequently broker narcotics transactions between larger scale distributors like defendant, and various drug customers.  Roman introduced a government informant to defendant, and DEA agents successfully conducted two controlled purchases from defendant. Following these deals, investigators installed a tracking device on a Toyota Camry defendant used during the controlled purchase operations.

On or about September 13, 2024, DEA task force investigators learned that defendant was expecting to receive a large quantity of drugs. Defendant had communicated with the government informant and implied that he was going to be receiving drugs. The two agreed to meet later that day in the same manner they had met for the two earlier drug deals.

Using physical and electronic surveillance techniques, the investigators followed defendant as he drove a Toyota Camry south from Portland along I-5. Defendant stopped at a

**Government's Sentencing Memorandum**                                                    **Page 3**

truck stop near Aurora, Oregon where he parked near a blue semi-truck. Defendant, interacted briefly with two Hispanic males near the semi-truck before returning to his car and driving north on I-5. Investigators noted that the semi-truck bore multiple license plates including a temporary Texas tag, a Mexico license plate, and a Maine license plate on the trailer. Investigators followed both defendant and the semi-truck from the truck stop.

Given the information gathered from their investigation, and the based on their observations at the truck stop, the DEA team believed that defendant had just received a quantity of drugs that he intended to distribute to others. Investigators stopped defendant on I-5 northbound near Tigard Oregon. Defendant was the driver and sole occupant of the Camry. Investigators detained defendant and lawfully searched the still mobile Camry following a K9 alert to the presence of narcotics in the car. Below is a photo of the drugs that were seized;



Inside the Camry, investigators seized 20,713.5 gross grams of methamphetamine and 820.4 gross grams of fentanyl pills. The combined converted drug weight from the Camry was 43,478 kilograms of converted drug weight. During a roadside interview, defendant indicated that he did not know the men from the semi-truck he had just been seen meeting with, and claimed

**Government's Sentencing Memorandum**                                        **Page 4**

that he did not know what was inside the bag that "a friend" had put in his car. Defendant did not provide any further information about his source(s) of supply.

Meanwhile other investigators were following the semi-truck as it traveled northbound on I-5 from the truck stop. Soon after investigator stopped Defendant, the semi-truck left the highway and parked at a public rest stop near Wilsonville Oregon, barely three miles from the truck stop.

By the time additional investigators arrived to safely stop the semi-truck, investigators saw that the truck was still running. Investigators were unable to see into the semi-truck due to dark window tinting on the cab windows. They announced their presence and commanded the occupants to open the door in both English and Spanish. After no answer, task force investigators opened the door to the cab to sweep the cab for occupants and dangerous items. Investigators found the keys in the ignition and that the still running truck had been abandoned. Investigators applied for a search warrant to search the semi-truck for evidence of narcotics distribution.

Investigators began to search the rest stop area for the occupants of the semi-truck. Investigators located the two men defendant had met with at the truck stop. They were hiding in the brush less than a mile away from the rest stop.

After advising both men from the semi-truck of their Miranda warnings in Spanish, they both made preliminary statements in the field. One claimed to be the driver and identified the other man as his mechanic. The driver admitted that there were drugs the suitcases found in the cab of the semi-trcuk. The other individual admitted that he was the mechanic and initially disclaimed any knowledge of drugs inside the semi-truck but later admitted that his DNA and finger prints would be found on the suitcases containing the drugs.

**Government's Sentencing Memorandum**                                                    **Page 5**

Investigators lawfully searched the truck after the warrant had been sworn out telephonically. Inside the cab, they discovered two large suitcases containing bulk quantities of methamphetamine. The drugs were weighed and field tested and found to be approximately 209.68 pounds of methamphetamine. Below is an image of the drugs seized from the semi-truck:



All three men were arrested on warrants issued pursuant to a federal complaint (filed in U.S. District Court of Oregon case number: 24-mj-198).

### B.    144 Months' Imprisonment is a Sufficient Sentence

Large scale narcotics traffickers profiteer from the misery of others. These complex drug trafficking organizations multiply their profits and distribution networks by recruiting others to assist in their criminal activities. Individual distributors, like defendant, not only serve a vital distribution role within the conspiracy. Defendant and others like him allow larger players to remain anonymous while others like defendant risk apprehension while transporting huge quantities of drugs for a share of the drug proceeds.

**Government's Sentencing Memorandum**                                    **Page 6**

The plea agreement in this case has already afforded defendant a number of significant concessions. First, the government permitted a plea to a lesser offense that permits defendant to avoid a mandatory 120-month prison sentence. Next, the government has agreed to a base offense level based upon the drugs in defendant's actual possession, despite the significant quantities his co-conspirators possessed when they were arrested shortly after meeting with defendant. Finally, the government agreed to forgo a potential 851 enhancement which would have increased defendant's sentence to a 180-month mandatory minimum sentence. The defendant disputes that he is eligible for this enhancement. The parties were able to reach a middle ground with the plea agreement that allows for defendant to seek a sentence of less than the mandatory minimum sentences that may have otherwise applied while the government can argue for a sentence that is consistent with the seriousness of the offense and defendant's prior criminal history.

The government anticipates the defendant will seek a downward variance to a sentence of 96 months' imprisonment. The PSR writer seems to agree that this is a sufficient sentence with a recommended sentence of 97 months' imprisonment. The PSR writer cites Judicial Sentencing Information Network (JSIN) data for other similarly situated defendants, "[f]or the 81 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 115 month(s) and the median length of imprisonment imposed was 120 month(s)." The PSR does not provide any additional facts or explanation to justify what amounts to a four-level variance from the calculated guideline range. Nor does the PSR explain why a 97 month sentence (approximately 24 months below the JSIN data, and more than 48 months less than the calculated advisory) would not lead to unwarranted sentencing disparities.

**Government's Sentencing Memorandum**                                    **Page 7**

The government has not received any additional materials from defendant to support a further variance that would justify a sentence outside the 121-151 month range. The plea agreement specifies the timing for defendant to submit mitigation materials prior to sentencing.

Defendant provided some mitigation explanations during the PSR process which does not seem to have any logical nexus to his crime. Defendant explained during his PSR interview that he had a bad break-up and was living alone while recovering from complications following a surgery. Defendant also explained that he grew up in Mexico to a low-income family, and that he witnessed violence between his uncles. The PSR report indicates defendant wants to get a job and help raise his middle-school aged daughter. These hardships are hardly uncommon, and many immigrants with similar backgrounds never run afoul of the criminal justice system.

The government's recommended sentence accounts for the seriousness of defendant's conduct and his prior criminal convictions. Despite having no lawful status in this country, defendant, a convicted violent felon, was released back into the community following his Assault in the Second Degree conviction. Defendant will correctly point out that Oregon's lenient sanctuary state policies permitted defendant to do so. However, defendant did not respond to this windfall by transforming into a law-abiding, hard-working member of the community, but rather took a short-cut to return to the lucrative and dangerous life of a narcotics trafficker.

The government anticipates defendant will urge this Court to find a further downward variance is necessary because the inevitable immigration detainer will preclude defendant's eligibility for other sentence reduction. This argument may be more persuasive if defendant was a first-time, low-level drug trafficker, but that is not the case.

In 2007, defendant was arrested for a drug trafficking offense in California and was sentenced to five months jail. (PSR ¶ 46). In 2016, Defendant stabbed a man during a parking lot

**Government's Sentencing Memorandum**                                    **Page 8**

dispute. (PSR ¶ 47). The victim in that case required surgery from his wounds. Defendant was sentenced to 70 months prison, and released back into the community in 2022, despite having no legal status in this country. Far from expressing gratitude for the opportunity to remain in this country and stay on the right side of the law, defendant returned to drug trafficking and profiting from the misery of others' addictions.

A sentence of 144 months custody reflects the seriousness of the offense, provides the community with protection from other crimes by defendant, and accounts for defendant's history and characteristics, including his prior criminal convictions. This sentence is in line with other similarly situated defendants and does not lead to unwarranted sentencing disparities.

For these reasons, a sentence of 144 months' imprisonment and four years' supervised release is more than warranted for defendant's offense. This sentence is sufficient but not more than necessary to achieve the goals of sentencing.

## III.    CONCLUSION

Based on the forgoing, the government recommends that this Court impose a sentence of 144 months' imprisonment, order defendant to pay a $100 fee assessment, followed by a four-year term of supervised release, subject to the standard conditions and special conditions set forth in the PSR. The government respectfully requests that the judgement reflect the agreed upon forfeiture and abandonment provisions set forth in the plea agreement.

Dated: July 6, 2026

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

PAUL T. MALONEY, OSB #013366
Assistant United States Attorney